Chester Leon **HARDY**, Plaintiff,

v.

**3 UNKNOWN AGENTS,**
**et al., Defendants.**

**No. CV 05–4520–MMM (MAN).**

United States District Court,
C.D. California.

Feb. 9, 2010.

Chester Leon Hardy, Ione, CA, pro se.

Albert Y. Muratsuchi, Elizabeth S. Angres, Mark V. Santa Romana, Terry A. Barak, Office of Attorney General of California, Los Angeles, CA, for Defendants.

## ORDER ACCEPTING AND ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

MARGARET M. MORROW, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Second Amended Complaint, all of the files and records herein, the Amended Report and Recommendation of United States Magistrate Judge, and the Objections filed by defendants. The time for filing Objections had passed and no Objections have been filed by plaintiff. The Court accepts and adopts the Magistrate Judge's Report and Recommendation, and the findings, conclusions, and recommendations therein.

**IT IS ORDERED** that:

The motion for summary judgment brought by the remaining defendants, Dr. Echendu and Dr. Fortaleza, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Motion"), is GRANTED, in part, and DENIED, in part, as follows:

    a. The Motion is DENIED with respect to the Eighth Amendment claim alleged against Dr. Echendu based on plaintiff's alleged ear infection and hearing loss;

    b. The Motion is GRANTED with respect to the Eighth Amendment claim alleged against Dr. Echendu based on plaintiff's psoriasis, and this claim is dismissed with prejudice;

    c. The Motion is GRANTED with respect to all claims alleged against Dr. Fortaleza, and these claims are dismissed with prejudice; and

    d. Dr. Fortaleza is granted summary judgment and is dismissed from this action with prejudice.

**IT IS FURTHER ORDERED** that the Clerk serve copies of the Order on plaintiff and on counsel for defendants.

**CHESTER LEON HARDY, Plaintiff,**

v.

**DR. NERIZZA ANDRADA, et al., Defendants.**

## AMENDED REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

MARGARET A. NAGLE, United States Magistrate Judge.

This Amended Report and Recommendation is submitted to the Honorable Margaret M. Morrow, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order No. 05–07 of the United States District Court for the Central District of California.

### INTRODUCTION

On July 26, 2005, plaintiff, a state prisoner proceeding *pro se,* filed a civil rights complaint pursuant to 42 U.S.C. § 1983 ("Complaint"). On July 29, 2005, the Court issued an "Order re Civil Rights Case," directing plaintiff to refrain from serving the Complaint on the defendants until after the Court had screened it pursuant to the screening provisions of the Prison Litigation Reform Act of 1995 ("PLRA"). Plaintiff nevertheless served the Complaint on two defendants, Dr. Nerizza Andrada and Dr. Victor Laus. On August 25, 2005, these defendants filed an Answer. On September 20, 2005, the Court dismissed the Complaint, with leave to amend, pursuant to the PLRA.

On December 6, 2005, plaintiff filed a First Amended Complaint, naming as defendants Drs. Andrada, Laus, Echendu, Fortaleza, and Fitter. Plaintiff properly served the First Amended Complaint on counsel for Drs. Andrada and Laus. On December 20, 2005, Drs. Andrada and Laus filed a motion to dismiss the First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On June 19, 2006, the Court issued a Report and Recommendation ("June 19, 2006 Report and Recommendation"), recommending that the motion to dismiss be denied as to Dr. Andrada and granted as to Dr. Laus. In addition, the Court screened the First ·Amended Complaint, pursuant to the PLRA, with respect to plaintiff's claims against Drs. Echendu, Fortaleza, and Fitter, and recommended the dismissal of plaintiff's claims against Dr. Fitter. On July 28, 2006, District Judge Morrow adopted the recommendations set forth in the June 19, 2006 Report and Recommendation, dismissed the claims against Drs. Laus and Fitter without leave to amend, and granted plaintiff leave to file a Second Amended Complaint realleging his claims against Drs. Andrada, Echendu, and Fortaleza.

On August 22, 2006, plaintiff filed a Second Amended Complaint. On August 31, 2006, Dr. Andrada filed an Answer. On September 25, 2006, the Court directed the United States Marshal to serve the Second Amended Complaint on Drs. Echendu and Fortaleza.

On December 11, 2006, Drs. Echendu and Fortaleza (collectively "defendants") filed a motion to dismiss the claims against them pursuant to Rule 12(b) [unenumerated] and 12(b)(6) of the Federal Rules of Civil Procedure. On February 1, 2007, Dr. Andrada filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. On May 8, 2007, plaintiff filed a Notice of Voluntary Dismissal of his claims against Dr. Andrada. On August 13, 2007, the Court issued a Report and Recommendation ("August 13, 2007 Report and Recommendation") recommending that: the motion to dismiss be denied as to Dr. Echendu, and granted in part and denied in part as to Dr. Fortaleza; and the action be dismissed as against Dr. Andrada. On November 15, 2007, District Judge Morrow entered an order adopting the recommendations set forth in the August 13, 2007 Report and Recommendation ("November 15, 2007 Order").

On December 21, 2007, defendants filed an Answer to the Second Amended Complaint. On July 28, 2008, defendants filed

a motion for summary judgment, or summary adjudication of issues, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Motion"). The Motion was accompanied by declarations and other evidentiary material, a Statement of Uncontroverted Facts and Conclusions of Law, and a proposed judgment. On July 29, 2008, the Court issued an order setting a briefing schedule for the Motion, and advising plaintiff, in light of his *pro se* prisoner status, of the requirements for opposing a summary judgment motion. *See Rand v. Rowland,* 154 F.3d 952 (9th Cir.1998); *Klingele v. Eikenberry,* 849 F.2d 409 (9th Cir.1988).

On November 24, 2008, plaintiff filed an opposition to the Motion ("Opposition"). Plaintiff's Opposition was accompanied by declarations and other evidentiary material and Plaintiff's Statement of Disputed Facts. On December 15, 2008, defendants filed a Reply to the Opposition and Evidentiary Objections. On January 7, 2009, plaintiff filed an opposition to Defendants' Evidentiary Objections.

On March 31, 2009, the Court issued a Report and Recommendation ("March 31, 2009 Report and Recommendation") recommending that the Motion be granted in part and denied in part. On April 21, 2009, Dr. Echendu filed objections to the March 31, 2009 Report and Recommendation ("Echendu Objections"). On April 23, 2009, plaintiff filed objections to the March 31, 2009 Report and Recommendation ("Hardy Objections").

On May 13, 2009, the Court issued a minute order ("May 13, 2009 Order"), directing supplemental briefing regarding plaintiff's retaliation claim against Dr. For-

taleza. On June 15, 2009, defendants filed a supplemental brief ("Def. Supp. Brief"). On July 13, 2009, plaintiff filed a supplemental opposition ("Supp. Opp."), accompanied by a supplemental declaration and evidentiary material. On August 5, 2009, defendants filed a supplemental reply ("Supp. Reply").

The Motion is submitted and ready for decision.

## PLAINTIFF'S REMAINING CLAIMS

After the entry of the November 15, 2007 Order, the claims remaining in this action are Claim Three against Dr. Echendu and a portion of Claim Four against Dr. Fortaleza. More specifically, the remaining claims are as follows:

(1) Plaintiff's Eighth Amendment claim against Dr. Echendu based on allegations that Dr. Echendu: (a) failed to treat plaintiff's ear infection, causing a loss of hearing in one ear; and (b) failed to provide adequate treatment for plaintiff's psoriasis.

(2) Plaintiff's Eighth Amendment claim against Dr. Fortaleza based on allegations that Dr. Fortaleza acted upon a threat to withhold medical treatment from plaintiff by: (a) failing to renew plaintiff's psoriasis and blood pressure medications; (b) failing to refer him to a dermatologist for his psoriasis; and (c) refusing to place plaintiff on medically unassigned status because of his back pain;

(3) Plaintiff's First Amendment retaliation claim against Dr. Fortaleza based on allegations that Dr. Fortaleza withheld medical treatment from plaintiff, as described above, in retaliation for plaintiff's filing of grievances regarding his medical care.[1] (Second Amended Complaint at 3–

---

1. In his Objections, plaintiff argued that although the Second Amended Complaint designates his claims against Dr. Fortaleza as arising solely under the Eighth Amendment, his factual allegations also support a retaliation claim under the First Amendment. (Har-

dy Objections at 1–4.) In general, the Court will not consider a new claim raised for the first time in response to a motion for summary judgment. *See Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1292–93 (9th Cir.2000). Nevertheless, a plaintiff proceeding *pro se*

5, 8; August 13, 2007 Report and Recommendation at 17, 20–21; November 15, 2007 Order at 2.)

Plaintiff seeks damages. (Second Amended Complaint at 10.)

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Federal Rules of Civil Procedure, Rule 56(c). In a trio of 1986 cases, the Supreme Court clarified the applicable standards for summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552. However, the moving party need not disprove the other party's case. *Id.* at 323–24, 106 S.Ct. at 2553. The moving party need not produce admissible evidence showing the absence of a genuine issue of material fact when the non-moving party has the burden

of proof, but may discharge its burden simply by pointing out that there is an absence of evidence to support the non-moving party's case. *Id.*

Once the moving party has met its burden, the non-moving party must go beyond the pleadings and, by the party's own affidavits or by other evidence, designate "specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e). The non-moving party must submit some evidence establishing the elements essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322, 106 S Ct. at 2552. When assessing whether the non-moving party has raised a genuine issue, the court must believe the non-moving party's evidence and must draw all justifiable inferences in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. Nevertheless, "the mere existence of a scintilla of evidence" is insufficient. *Id.* at 252, 106 S.Ct. at 2512. When the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

For purposes of summary judgment, a verified complaint may be treated as an affidavit or declaration to the extent that it is based on personal knowledge and sets forth facts admissible in evidence.[2]

should be afforded the benefit of any doubt in ascertaining what claims he raised in his complaint and argued to the court in his later filings. *Alvarez v. Hill,* 518 F.3d 1152, 1158 (9th Cir.2008). Thus, as the Court notified the parties in its May 13, 2009 Order directing supplemental briefing, the Court has construed the Second Amended Complaint to assert a First Amendment retaliation claim against Dr. Fortaleza in addition to an Eighth Amendment claim.

2. The Second Amended Complaint includes a "Verifi[c]ation" that states: "I do declare upon penalty of perjury that the above statements are true and correct as based upon my

information and belief." (Second Amended Complaint at 10). Defendants have not objected to the sufficiency of this verification.

To constitute an "affidavit" under Rule 56(e), a verification must be based upon personal knowledge and not just belief. *Schroeder v. McDonald,* 55 F.3d 454, 460 (9th Cir. 1995). A statement based on "information and belief" does not raise a triable issue of fact. *Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.,* 944 F.2d 1525, 1529 (9th Cir.1991); *Taylor v. List,* 880 F.2d 1040, 1045 n. 3 (9th Cir.1989). However, personal knowledge may be inferred from the declaration itself, and a declaration or verified complaint will not be disre-

*Schroeder*, 55 F.3d at 460; *McElyea v. Babbitt*, 833 F.2d 196, 197–98 (9th Cir. 1987); Fed.R.Civ.P. 56(e).

## DEFENDANTS' EVIDENTIARY OBJECTIONS

In their Evidentiary Objections, defendants object to portions of the two declarations submitted by plaintiff in support of his Opposition, namely, the Declaration of Chester Leon Hardy, dated November 20, 2008 ("Hardy Decl."), and the Declaration of Kenneth Walton, dated November 20, 2008 ("Walton Decl."). Defendants also object to Exhibit A to the Hardy Decl.

■ As a general principle, the declarations submitted by a party opposing summary judgment are treated more indulgently than the moving party's papers. *See Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir.1985). With this principle in mind, the Court rules on defendants' Evidentiary Objections as follows:

### A. *Hardy Decl.*

■ 1. Defendants object to plaintiff's assertion, in Paragraph 3, that he sustained an ear infection at the Riverside County Jail ("Jail") as speculative and improper lay testimony. The objection is OVERRULED. There is medical evidence before the Court, submitted in connection with Dr. Andrada's summary judgment motion, that plaintiff was diagnosed with an ear infection while at the Jail. (*See*

Motion for Summary Judgment filed by defendant Nerizza Andrada on January 31, 2007, Declaration of Dr. Victor Laus, dated January 27, 2007 ("Laus Decl.") ¶ 5.)

■ 2. Defendants object to plaintiff's statement, in Paragraph 4, that he told nurse Wonam he had "back problems (major spinal fusion)" and "an ear infection which . . . persistently caused [him] pain," on the grounds that it constitutes speculation and improper lay testimony as to whether plaintiff's back problems were caused by major spinal fusion and his ear pain was caused by an ear infection. Defendants make the same objection to plaintiff's statement, in Paragraph 5, that he told Dr. Echendu about his "back pain due to major surgery" and "the pain in [his] right ear from the ear infection." Defendants' objections are OVERRULED. Plaintiff is describing what he told nurse Wonam and Dr. Echendu. The Court does not view these statements as evidence of the actual medical causes of his back and ear pain.

■ 3. Defendants object that the phrase "[d]ue to my inability to get treatment for my ear infection," in Paragraph 7, constitutes speculation and improper lay testimony regarding whether plaintiff had an ear infection. The objection is OVERRULED. Plaintiff is merely describing his motivation for contacting class counsel. The statement does not constitute evidence

garded merely because the declarant has not expressly stated that he has personal knowledge of the matters he attests are true. *See Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir.1990); *Edwards v. Toys "R" Us*, 527 F.Supp.2d 1197, 1201 (C.D.Cal. 2007); *see also Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir.2004) (*pro se* litigant's contentions in motions and pleadings would be considered as evidence on summary judgment when they were made on personal knowledge, set forth matters admissible in evidence, and the litigant attested under penalty of perjury

that they were true and correct); *Schroeder*, 55 F.3d at 460 & n. 10 (although plaintiff stated in his verification that the facts in his complaint were true and correct "as known to me," the complaint would be treated as an opposing affidavit because its "allegations were not based purely on [plaintiff's] belief").

The Court, therefore, will consider plaintiff's allegations in the Second Amended Complaint as evidence for purposes of this Motion to the extent that it is evident they are based on personal knowledge and are otherwise admissible.

that plaintiff's ear condition was caused by an ear infection.

■ 4. Defendants object that, to the extent plaintiff declares, in Paragraph 8, that his filing of a grievance "resulted in defendant Echendu ... refer [ring him] to an audiologist," he has no personal knowledge of what caused Dr. Echendu's referral. Defendants misread Paragraph 8. Plaintiff declares that, after he filed a grievance, nurse Avery gave him a hearing test, and he implies that the results of the hearing test caused Dr. Echendu to refer him to an audiologist. With that clarification, the objection is SUSTAINED, because plaintiff has no personal knowledge of what caused Dr. Echendu's audiologist referral. While a rational fact-finder could infer a causal relationship between the grievance, the hearing test, and the audiologist referral, the inference is not properly included in a declaration.

■ 5. Defendants object to plaintiff's statement, in Paragraph 9, that "with the four month interval, the infection finished its attack on my hearing," as speculative and improper lay opinion testimony as to whether plaintiff had an ear infection while under Dr. Echendu's care that caused a loss of hearing. The objection is SUSTAINED.

■ 6. Defendants object to plaintiff's statement, in Paragraph 10, that the audiologist recommended a referral to an ENT specialist "because of 'sudden onset loss' of hearing," as speculative and not based on personal knowledge. The objection is OVERRULED. The audiologist's notes contain a notation "refer ENT for sudden onset loss." (Declaration of W. Anthony Echendu, M.D. ("Echendu Decl."), Ex. 9.)

■ 7. Defendants object to plaintiff's statement, in Paragraph 11, that Dr. Echendu ordered an ENT consultation "due in part" to plaintiff's grievance. De-

fendants contend that plaintiff has no personal knowledge of why Dr. Echendu ordered an ENT consultation. The objection is SUSTAINED. Defendants also object to plaintiff's statement, in the same paragraph, that the consultation was treated as routine even though "it was a [requested] examination for 'sudd[e]n onset loss' of hearing." Defendants contend that plaintiff has no personal knowledge of whether a "sudden onset loss" of hearing caused Dr. Echendu to order an ENT consultation. The objection is OVERRULED. The medical records speak for themselves. (*See* Para. 6 above.)

■ 8. Defendants object to plaintiff's assertion, in Paragraph 12, that Dr. Bagea "was disgusted by the lack of proper treatment" for plaintiff's psoriasis, as inadmissible hearsay. The objection is SUSTAINED.

■ 9. Defendants object to plaintiff's statements, in Paragraph 15, that he suffered an "allergic reaction" to Soriatane medication, and was in pain as a result, as speculative and improper lay testimony regarding whether plaintiff suffered an allergic reaction to Soriatane. The objection is SUSTAINED to the extent that plaintiff asserts that the allergic reaction was caused by the Soriatane and OVERRULED in all other respects. *See Southern California Housing Rights Center v. Los Feliz Towers Homeowners Association*, 426 F.Supp.2d 1061, 1070 (C.D.Cal. 2005) (declarant has personal knowledge of her own symptoms).

10. Defendants object to Paragraph 16, in its entirety, on the grounds of speculation and lack of personal knowledge. In Paragraph 16, plaintiff declares that Dr. Echendu never examined him. The objection is OVERRULED as to the first two sentences and SUSTAINED as to the third sentence, beginning with, "Either this doctor was a germaphobe ...."

11. Defendants object to plaintiff's statement, in Paragraph 20, that he told Dr. Fortaleza that he "had seen outside doctors regarding [his] hearing loss and that it was documented," as inadmissible hearsay with respect to the documentation. The objection is OVERRULED. Plaintiff is merely recounting what he told Dr. Fortaleza. Defendants further object to plaintiff's assertion, in the same paragraph, that Dr. Fortaleza's smile "told" plaintiff that he was pleased to be able to deny him accommodation. The objection is OVERRULED to the extent plaintiff states that he observed Dr. Fortaleza smile, and is SUSTAINED to the extent that plaintiff purports to assert what Dr. Fortaleza's state of mind was at the time of the smile.

12. Defendants object to plaintiff's statement, in Paragraph 21, that plaintiff was interviewed by Dr. Fortaleza regarding his request for an accommodation due to "the chronic pain [he] had as the result of [his] spine being crushed in 1993," as speculation and improper lay testimony regarding whether the pain was caused by the spine injury. The objections is OVERRULED; plaintiff is describing the request that led to this interview. Defendants also object to plaintiff's statement, in the same paragraph, that Dr. Fortaleza denied his request for a disability accommodation without examining him or requesting records, on the grounds of lack of personal knowledge and speculation. The objection is OVERRULED to the extent that plaintiff is asserting his belief that he was not examined, and is SUSTAINED to the extent that plaintiff asserts that Dr. Fortaleza failed to request records.

13. Defendants object, on relevance grounds, to Paragraph 23, in which plaintiff declares that Dr. Fortaleza refused his request to be placed on medically unassigned status due to an ingrown toe-nail, because plaintiff's claim pertaining to his ingrown toenail has been dismissed as unexhausted. The objection is OVERRULED. The evidence has some relevance to plaintiff's claim that Dr. Fortaleza denied his request for medically unassigned status due to back pain for nonmedical reasons. *See also Burch v. Regents of University of California,* 433 F.Supp.2d 1110, 1119 (E.D.Cal.2006) (noting that, because irrelevant facts cannot give rise to a triable issue, relevance objections are redundant). To the extent defendants object that plaintiff's statement as to whether the podiatrist recommended a "layin" constitutes inadmissible hearsay, the objection is SUSTAINED.

**B.** *Walton Decl.*

Defendants object to inmate Walton's description of plaintiff as improper character evidence. Plaintiff admits that the statements quoted by defendants constitute character evidence "which should not have been made." (Opposition to Defendants' Evidentiary Objections at 7). Thus, the objection is SUSTAINED. In any event, plaintiff's truthfulness is not an issue here, because the Court is obliged to accept plaintiff's evidence as true. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

**C.** *Exhibit A to Hardy Decl.*

Plaintiff has attached to his declaration a copy of a letter addressed to him, on a law firm letterhead, bearing a signature "James Dye" above the name "James I. Dye, Paralegal." (Hardy Decl., Ex. A). Defendants object that the letter is insufficiently authenticated and constitutes inadmissible hearsay. Plaintiff states, in his opposition to the Evidentiary Objections (at 7), that Exhibit A is a true and correct copy of the letter and that he simply forgot to mention this in his decla-

ration. This statement does not authenticate the letter, because plaintiff did not make it under penalty of perjury. However, defendants do not dispute that the letter is what it purports to be, and there is no reason to doubt that plaintiff *could* authenticate it. *See Hal Roach Studios, Inc. v. Feiner & Co.*, 896 F.2d 1542, 1551 (9th Cir.1990) (court's consideration of unauthenticated evidence was harmless error when a competent witness with personal knowledge could have authenticated it); *Burch*, 433 F.Supp.2d at 1120 (criticizing authentication objections on summary judgment motions "where the objecting party does not contest the authenticity of the evidence submitted but nevertheless makes an evidentiary objection based on purely procedural grounds"). Thus, the objection is OVERRULED.

## FACTUAL BACKGROUND

Plaintiff is currently incarcerated at Mule Creek State Prison in Ione, California. His remaining claims in this action challenge his medical treatment while he was confined at California State Prison–Los Angeles County in Lancaster, California ("CSP–LAC"). (Second Amended Complaint at 1.)

▮ While plaintiff was still a pre-trial detainee at the Jail, he was treated for an ear infection. (*See* Laus Decl. at ¶ 5(n), (p)-(t).)[3] On November 11, 2003, plaintiff was transferred from the Jail to North Kern State Prison, where he again was treated for an ear infection. (Second Amended Complaint at 6.) On February 6, 2004, he was transferred from North Kern State Prison to CSP–LAC. (Hardy Decl. ¶ 4; Second Amended Complaint at 5, 6.)

At CSP–LAC, plaintiff was seen by nurse Wonam; plaintiff told Wonam that he had psoriasis "all over his body," back problems, a painful ear infection, and a hearing problem in the same ear. (Hardy Decl. ¶ 4; Second Amended Complaint at 6.) The progress notes for the visit state that plaintiff told the nurse that he had psoriasis, back problems, and hearing problems, and that he needed to see a physician "ASAP." (Echendu Dec., Ex. 1.)

On February 11, 2004, plaintiff was seen by Dr. Echendu. (Hardy Decl. ¶ 5; Echendu Decl. ¶ 7; Second Amended Complaint at 6.) Plaintiff requested medication for his psoriasis, and Dr. Echendu ordered that plaintiff be given Lidex cream, hydrocortisone cream, and coal tar shampoo. (Hardy Decl. ¶ 5; Echendu Decl. ¶ 7; Exs. 1 and 2.) Dr. Echendu also ordered nitroglycerin for plaintiff's chest pains and Vasotec for his high blood pressure; plaintiff was scheduled to return to the clinic in 90 days. (Hardy Decl. ¶ 5; Echendu Decl. ¶ 7; Exs. 1, 2.)

Plaintiff declares that, during this visit, he told Dr. Echendu that he had pain in his right ear "from the ear infection" and difficulty hearing, but Dr. Echendu indicated that he did not have with him the equipment to examine plaintiff's ear,[4] and only had time to take care of "one or two problems at a time" because other inmates were waiting. (Hardy Decl. ¶ 5; Second Amended Complaint at 6.)

Dr. Echendu saw plaintiff again on March 11, 2004. (Hardy Decl. ¶ 6; Echendu Decl. ¶ 8, Ex. 3.) Dr. Echendu declares that plaintiff requested an increased supply of Lidex cream for his psoriasis, and

---

**3.** Dr. Laus's declaration was submitted by Dr. Andrada in support of her motion for summary judgment, before plaintiff voluntarily dismissed his claim against her. "[It] is well-established that a party opposing summary judgment may rely on material already on file in the case." *McLaughlin v. Liu*, 849 F.2d 1205, 1206 n. 3 (9th Cir.1988).

**4.** According to plaintiff, the consultation did not take place in the doctor's office. (Second Amended Complaint at 6.)

Dr. Echendu increased the prescription to one tube weekly for two months. (Echendu Decl. ¶ 8, Exs. 3, 4.) Plaintiff denies that he asked Dr. Echendu for increased medication; plaintiff maintains that he wanted his back to be examined by Dr. Echendu (believing that the examination would lead to a dermatologist referral), but Dr. Echendu refused. (Hardy Decl. ¶ 6.) Plaintiff also contends that he requested that Dr. Echendu look at his ear, but Dr. Echendu "focused on [plaintiff's] psoriasis." (*Id.*)

Plaintiff wrote a letter to class counsel in the *Armstrong v. Schwarzenegger* action. (Hardy Decl. ¶ 7.) A paralegal responded, instructing plaintiff to file an emergency grievance if he "still [had] not received medical attention for [his] ears." (*Id.;* Ex. A.) Plaintiff submitted a grievance on April 5, 2004. (Hardy Decl. ¶ 8, Ex. B.) He stated that he could not hear in his right ear and requested a hearing aid, an ear examination, and a vest putting others on notice of his condition. (Hardy Decl., Ex. B.) On April 15, 2004, registered nurse Avery administered a hearing test to plaintiff. (Hardy Decl. ¶ 8; Echendu Decl. ¶ 9, Ex. 5; Second Amended Complaint at 7.) On April 22, 2004, Dr. Echendu referred plaintiff to an audiologist. (Echendu Decl. ¶ 10, Ex. 6; *see* Hardy Decl. ¶ 8.) However, plaintiff declares that Dr. Echendu still refused to examine his ear. (Hardy Decl. ¶ 8.)

On May 19, 2004, plaintiff saw Dr. Echendu, who provided an antibiotic (Clindamycin) to treat a large swelling on the back of plaintiff's head. (Echendu Decl. ¶ 11, Ex. 7, 8; Hardy Decl. ¶ 9.) Dr. Echendu also ordered hydrocortisone cream and Selsun Blue shampoo for plaintiff's psoriasis. (Echendu Decl. ¶ 11, Ex. 7, 8.) Plaintiff declares that Dr. Echendu again refused to look inside plaintiff's ear. (Hardy Decl. ¶ 9.)

On June 21, 2004, plaintiff was examined by an audiologist, who conducted a hearing test and recommended that plaintiff be referred to an ENT (Ears, Nose and Throat) specialist. (Echendu Decl. ¶ 12, Exs. 7, 9; Hardy Decl. ¶ 10.) According to the audiologist's notes, plaintiff denied a history of chronic ear infections but stated that he had experienced hearing loss since an ear infection on September 9, 2003. (Echendu Decl., Ex. 7.)

On August 11, 2004, Dr. Echendu ordered an ENT consultation for plaintiff. (Echendu Decl. ¶ 8, Ex. 13; Hardy Decl. ¶ 11.) Dr. Echendu also prepared and signed a Disability Placement Program Verification to provide plaintiff with an accommodation for his hearing impairment. (Echendu Decl. ¶ 13, Ex. 10). On August 22, 2004, Dr. Echendu ordered Enalapril for plaintiff's high blood pressure. (Echendu Decl. ¶ 14, Ex. 12.)

On August 31, 2004, plaintiff received an outside consultation for his psoriasis with Dr. Arthur Huntley, a dermatologist. (Echendu Decl. ¶ 15, Ex. 13; Hardy Decl. ¶ 12). Plaintiff was referred to Dr. Huntley by prison physician Dr. Sudhir Bagea. (Hardy Decl. ¶ 12; Echendu Decl., Ex. 13.) In his report, Dr. Huntley recommended that, in addition to topical creams, plaintiff be given a fasting lipid panel and, if his liver function was normal, be started on oral therapy, namely, Soriatane medication. (Echendu Decl., Ex. 13.)

On September 9, 2004, Dr. Echendu ordered Soriatane, Dovonex cream, and hydrocortisone cream for plaintiff's psoriasis, and also ordered that a fasting lipid blood test to be conducted within four days. (Echendu Decl. ¶ 16, Exs. 14, 15.) Plaintiff complains that Dr. Echendu did not follow the dermatologist's recommendation to conduct the fasting lipid panel test before starting plaintiff on the Soriatane

medication. (Hardy Decl. ¶ 13; Second Amended Complaint at 8.)

On October 15, 2004, plaintiff was seen by Dr. Echendu, who noted that plaintiff's skin lesions were resolving and ordered a series of blood and kidney tests and a follow-up appointment. (Echendu Decl. ¶ 17, Exs. 16 and 17.) Plaintiff states that he told Dr. Echendu that he was having problems with his toenails and fingernails, and Dr. Echendu told him that it was due to the Soriatane. (Second Amended Complaint at 8.)

On October 19, 2004, plaintiff received an outside ENT consultation with Dr. Phillip Whong. (Echendu Decl. ¶ 18, Ex. 18; Hardy Decl. ¶ 14.) According to Dr. Whong's notes, plaintiff told Dr. Whong that plaintiff had pus drainage and pain in his right ear around September 9, 2003. (Echendu Decl., Ex. 18.) Dr. Whong's notes reflect that plaintiff indicated he no longer had ear pain. (*Id.*) Plaintiff declares that, by the time he received the ENT consultation, the pain was gone, "along with most of [his] hearing in [his] right ear." (Hardy Decl. ¶ 14.) Dr. Huntley recommended a full audiometric test. (Echendu Decl. ¶ 18, Ex. 18; Hardy Decl. ¶ 14.) Plaintiff declares that he never received the test while at CSP–LAC. (Hardy Decl. ¶ 14.)

On October 22, 2004, and October 27, 2004, plaintiff saw Dr. Echendu for medical problems related to an ingrown toenail and received antibiotics and a podiatry referral. (Echendu Decl. ¶¶ 19, 20, Exs. 19, 20.) On November 4, 2004, Dr. Echendu conducted a follow-up examination of plaintiff's psoriasis and ordered Benadryl and a followup examination in one week. (Echendu Decl. ¶ 22, Exs. 23, 24.) Plaintiff contends that Dr. Echendu prescribed Benadryl to counter an allergic reaction to the Soriatane. (Hardy Decl. ¶ 15.) Dr. Echendu's declaration is silent as to why he prescribed the Benadryl, but his progress notes suggest that the allergic reaction may have been triggered by the Levaquin medication prescribed by the podiatrist. (Echendu Decl. ¶¶ 18, 21, Exs. 21, 23.)

On November 17, 2004, plaintiff saw Dr. Echendu and told him that plaintiff's psoriasis had improved. (Echendu Decl. ¶ 23, Ex. 25; Hardy Decl. ¶ 15.) Plaintiff declares, however, that he requested a followup consultation with Dr. Huntley, because he was having an allergic reaction to the Soriatane, and Dr. Echendu denied the request. (Hardy Decl. ¶ 15.) Dr. Echendu conducted a follow-up examination of the surgical removal of plaintiff's ingrown toenail, and prescribed an antibiotic. (Echendu Decl. ¶ 23, Exs. 25, 26.) This was the last time Dr. Echendu rendered medical care to plaintiff. (Echendu Decl. ¶ 6.)

On January 31, 2005, Dr. Fortaleza interviewed plaintiff regarding a grievance he had filed, in which he complained that Dr. Echendu had put him on Soriatane medication without first conducting a fasting lipid panel blood test. (Hardy Decl. ¶ 19, Ex. C; Declaration of Paul J. Fortaleza, D.O., dated July 23, 2008 ("Fortaleza Decl.") ¶ 7, Ex. 1.) According to plaintiff's declaration, Dr. Fortaleza threatened plaintiff that he would not be provided with any medical care if he did not withdraw his administrative appeal. (Hardy Decl. ¶ 19; Second Amended Complaint at 8.) Dr. Fortaleza denies that he ever made such a statement. (Fortaleza Decl. ¶ 7.) Dr. Fortaleza declares that, during the interview, plaintiff stated that he did not want to discuss his administrative appeal. (Fortaleza Decl. ¶ 7, Ex. 1.)

On February 15, 2005, March 2, 2005, and March 3, 2005, plaintiff attempted to see Dr. Fortaleza to obtain renewals of his prescriptions for psoriasis and blood pressure medication, but plaintiff was turned

away. (Second Amended Complaint at 8.) On March 7, 2005, Dr. Fortaleza saw plaintiff and ordered a liver function test, a lipid panel test for his cholesterol, a blood count test, and a follow-up examination in four weeks, and prescribed three creams or ointments for plaintiff's psoriasis and Enalapril for his hypertension. (Fortaleza Decl. ¶ 8, Ex. 2.) On March 11, 2005, Dr. Fortaleza ordered a new prescription for Enalapril to be refilled every 90 days for one year. (Fortaleza Decl. ¶ 9, Ex. 3.) On April 18, 2005, Dr. Fortaleza saw plaintiff for an infected ingrown toenail and ordered an antibiotic, Motrin, and a follow-up examination in a week. (Fortaleza Decl. ¶ 10, Exs. 4, 5.)

On May 25, 2005, Dr. Fortaleza determined that, because of plaintiff's high cholesterol levels, he should not use Soriatane for his psoriasis. (Fortaleza Decl. ¶ 11, Ex. 6.) He ordered an appointment for plaintiff to be examined by a physician assigned to his prison yard, and recommended that the physician consider plaintiff for treatment with Dovonex or Kenalog. (*Id.*)

On June 1, 2005, Dr. Fortaleza ordered a follow-up examination for plaintiff with dermatologist Dr. Huntley. (Fortaleza Decl. ¶ 12, Exs. 8. 9.) However, the consultation did not take place; plaintiff was not seen by Dr. Huntley until April 17, 2007, long after he had been transferred from CSP–LAC. (Hardy Decl. ¶ 24, Ex. G.) Dr. Fortaleza also ordered prescriptions for Dovonex and Mevacor, to be refilled every 90 days for one year, and lipid panel and liver enzyme tests. (Fortaleza Decl. ¶ 12, Ex. 8.) On June 8, 2005, Dr. Fortaleza ordered an audiology examination, based on plaintiff's complaints of hearing loss. (Fortaleza Decl. ¶ 13, Ex. 10.) On July 8, 2005, Dr. Fortaleza again saw plaintiff. (Fortaleza Decl. ¶ 14.) The physician ordered stool tests, stopped plaintiff's prescription for Motrin, ordered a prescription for Zantac and Tylenol, and ordered a complete blood count test. (Fortaleza Decl. ¶ 14, Ex. 11.)

On July 19, 2005, Dr. Fortaleza interviewed plaintiff regarding an administrative appeal seeking disability accommodation for reduced prison duty and a special mattress. (Fortaleza Decl. ¶ 15, Ex. 12; Hardy Decl. ¶ 21.) Plaintiff complained about his chronic back pain and told Dr. Fortaleza that he had back surgery in 1993. (Fortaleza Decl. ¶ 15; Hardy Decl. ¶ 21.) Dr. Fortaleza told plaintiff that there was no documentation of the back surgery in his medical files. (Fortaleza Decl. ¶ 15; Hardy Decl. ¶ 21.) Dr. Fortaleza declares that he observed that plaintiff did not show any mobility problem and had normal ambulatory gait and a normal range of back motion; thus, he concluded that plaintiff's request for a medical lay-in was not justified. (Fortaleza Decl. ¶¶ 15, 21, Ex. 12.) On July 25, 2005, Dr. Fortaleza denied plaintiff's request for disability accommodation. (Fortaleza Decl. ¶ 16, Ex. 13.) Plaintiff declares that Dr. Fortaleza denied his request without examining his back, requesting any diagnostic tests, or requesting plaintiff's medical records pertaining to his back surgery. (Hardy Decl. ¶ 21.) As a result, plaintiff was obliged to continue working in the kitchen, and his back pain was exacerbated by the lifting, bending and twisting necessitated by his duties. (Second Amended Complaint at 9.)

On August 3, 2005, Dr. Fortaleza interviewed plaintiff regarding his request for a disability accommodation for a hearing impairment. (Fortaleza Decl. ¶ 17, Ex. 14; Hardy Decl. ¶ 20.) Dr. Fortaleza denied plaintiff's request based on his observations that plaintiff could hear his name being called while seated in the waiting room and could hear at a conversational level without difficulty. (Fortaleza Decl. ¶ 17, Exs. 13, 14.) Plaintiff tried to explain

to Dr. Fortaleza that he had seen outside physicians regarding his hearing loss, and it was documented. (Hardy Decl. ¶ 20.) Plaintiff has also submitted a declaration by an inmate at Mule Creek Prison, where plaintiff is currently incarcerated, who declares that he has personally observed that plaintiff has difficulty hearing on his right side when his hearing aid is not on. (Walton Decl. ¶ 3.)

Plaintiff declares that, after he was transferred from CSP–LAC to the California State Prison at Avenal, he received a "lower bunk chrono" for his back problem, and after he was transferred to Mule Creek State Prison, he received a "lower bunk chrono" and a consultation with a dermatologist. (Hardy Decl. ¶¶ 22, 24.)

## DISCUSSION

### I. THE APPLICABLE STANDARDS FOR PLAINTIFF'S EIGHTH AMENDMENT CLAIMS

A prisoner asserting a Section 1983 claim for denial of medical care must show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). A serious medical need exists if failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997) (*en banc*). Deliberate indifference requires that defendants purposefully ignore or fail to respond to the prisoner's pain or medical need. *McGuckin*, 974 F.2d at 1060. Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which prison physicians provide medical care." *Id.* at 1059.

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.2004). A showing of medical malpractice or negligence is insufficient to establish deliberate indifference. *Id.* "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 105–06, 97 S.Ct. at 292.

If medical treatment is delayed rather than denied, the delay generally amounts to deliberate indifference only if it caused further harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir.1990); *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir.1985) (*per curiam*). Moreover, a mere difference of opinion between an inmate and medical staff, or among medical staff, regarding appropriate medical treatment is generally insufficient to constitute deliberate indifference. *See Toguchi*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.1996); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.1989). A prisoner asserting an Eighth Amendment claim against his physician must show that the course of treatment the physician chose was medically unacceptable under the circumstances, and that the physician chose it in conscious disregard of an excessive risk to the plaintiff's health. *Toguchi*, 391 F.3d at 1058; *Jackson*, 90 F.3d at 332. In addition, a medical decision that does not meet this test may nevertheless violate the Eighth Amendment if it was taken not in the exercise of medical judgment, but for non-medical reasons. *See Jackson*, 90 F.3d at 332 (defendant physicians were not entitled to qualified immunity when plain-

tiff alleged that they denied him a kidney transplant because of personal animosity).

## II. *DR. ECHENDU'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED IN PART AND DENIED IN PART.*

In Claim Three, plaintiff contends that Dr. Echendu showed deliberate indifference to plaintiff's serious medical needs, because Dr. Echendu failed to treat plaintiff's ear infection and inadequately treated his psoriasis. (Second Amended Complaint at 5.)

### A. *There is A Triable Issue As To Plaintiff's Eighth Amendment Claim Against Dr. Echendu Based On His Treatment Of Plaintiff's Ear Condition.*

■ Plaintiff contends that Dr. Echendu failed to treat his ear infection, and as a result, plaintiff lost his hearing in his right ear. (Second Amended Complaint at 2.) Defendants contend that there is no evidence either that plaintiff had an ear infection constituting a serious medical need or that Dr. Echendu was deliberately indifferent to plaintiff's medical need for treatment of his ear. (Motion at 10–12.)

First, defendants contend that there is no evidence that plaintiff had an ear infection while he was under Dr. Echendu's care, because no medical provider diagnosed an ear infection. (Reply at 3.) Dr. Echendu declares that, based on his medical experience and his review of plaintiff's medical records, plaintiff "did not present an ear infection or any other ear condition which posed a substantial risk of serious harm or serious medical need" while he was under Dr. Echendu's care. (Echendu Decl. ¶ 25.) Dr. Echendu further declares that, although plaintiff complained of hearing loss, Dr. Echendu never personally observed any indication of an ear infection or any other ear condition. (*Id.*) Defendants also point out that: on June 21,

2004, plaintiff was examined by an audiologist, but there is no record that he had an ear infection at that time; and, on October 19, 2004, plaintiff told an outside ENT specialist that he had no ear pain, and the specialist found that plaintiff's tympanic membrane was "perfectly normal." (*Id.* at ¶¶ 12, 18, Exs. 7, 9, 18.) Finally, defendants point to evidence that plaintiff told the audiologist and the ENT specialist that plaintiff suffered an ear infection and hearing loss while at the Jail and, based on that evidence, they argue that plaintiff suffered his entire hearing loss while still at the Jail, before he was under Dr. Echendu's care. (Reply at 3; Echendu Decl., Exs. 7, 18.)

Critically, however, Dr. Echendu never declares that he based his conclusion that plaintiff did not have an ear infection on an examination of plaintiff's ear. Dr. Echendu may intend the Court to infer—from his statement that, based on his medical experience, he concluded that plaintiff did not have an ear infection—that he conducted an examination or observation adequate for the purpose of making that determination. Dr. Echendu's statement is too vague, however, to support such an inference. *See Taylor,* 880 F.2d at 1045 (conclusory allegations insufficient to support summary judgment). Viewing the evidence, as the Court must, in the light most favorable to plaintiff, neither Dr. Echendu's declaration nor the medical records before the Court contain any indication that Dr. Echendu ever examined plaintiff's ear for a possible infection. (*See* Echendu Decl. ¶¶ 7, 8, 10, 11, Exs. 1, 3, 10, 11.)

Moreover, plaintiff unequivocally asserts that Dr. Echendu never looked into his ears "the whole time plaintiff was in Dr. Echendu's care." (Second Amended Complaint at 2.) Plaintiff declares that, on February 11, 2004, he told Dr. Echendu about the pain in his right ear and his difficulty

hearing in that ear, but plaintiff was told by Dr. Echendu that he did not have his tool for conducting an ear examination with him and, also, could only handle "one or two" of plaintiff's health problems at the time. (Hardy Decl. ¶ 5.) Plaintiff further declares that, on March 11, 2004, he requested that Dr. Echendu look at his ear, but Dr. Echendu focused only on plaintiff's psoriasis. (*Id.* at ¶ 6.) Plaintiff also declares that: Dr. Echendu did not examine plaintiff's ear, even when Dr. Echendu referred plaintiff to an audiologist on April 5, 2004; and Dr. Echendu refused to look into plaintiff's ear on May 19, 2004, when the physician treated plaintiff for a swelling on the back of his neck. (*Id.* at ¶¶ 7, 9.) Thus, the record before the Court contains evidence, which is not expressly controverted, that Dr. Echendu did not look into plaintiff's ear, and no evidence, either by Dr. Echendu or a medical expert, that Dr. Echendu was nevertheless able, based on other observations, to make a medical judgment that plaintiff did not have an ear infection.

Defendants argue that there is no evidence that plaintiff, in fact, had an ear infection while under Dr. Echendu's care, because plaintiff's own belief that he had one constitutes inadmissible lay testimony. (Reply at 3.) The Court agrees that plaintiff is not competent to diagnose his symptoms as an ear infection. *See Southern California Housing Rights Center,* 426 F.Supp.2d at 1069–70. However, plaintiff has personal knowledge of his symptoms, and he declares that he suffered pain in his ear the entire time he was under Dr. Echendu's care until he was prescribed antibiotics on May 19, 2004.[5] (Hardy Decl. ¶ 17; *see* ¶ 9.) Moreover, there is evidence before the Court, submitted in support of Dr. Andrada's motion for summary judg-

ment, that while plaintiff was confined at the Jail, he was treated for ear infections on September 22, 2003, September 30, 2003, October 6, 2003, October 7, 2003, October 21, 2003, and November 7, 2003. (Laus Decl. ¶ 5.) This evidence suggests that plaintiff was familiar with the symptoms of an ear infection. Given the lack of specificity in Dr. Echendu's declaration regarding *why* he concluded that plaintiff did not have an ear infection, on the one hand, and evidence that plaintiff had been treated for ear infections while at the Jail and was complaining about ear pain to Dr. Echendu and others at CSP–LAC, on the other hand, the Court concludes that there is a triable issue as to whether plaintiff had an ear infection while under Dr. Echendu's care.

The Court's conclusion is unaltered by defendants' argument that neither the audiologist nor the ENT specialist who examined plaintiff on June 21, 2004, and October 19, 2004, respectively, diagnosed an ear infection, and that the ENT specialist described plaintiff's tympanic membrane as normal. (Echendu Decl. ¶¶ 12, 18, 26, Exs. 7, 9, 18.) Plaintiff does not contend that he had an ear infection by the time of these consultations. According to plaintiff, the antibiotic that Dr. Echendu prescribed on May 19, 2004, for the swelling and discharge on the back of plaintiff's head, cured the ear infection, and thus, the audiologist and ENT specialist did not find any ear infection when they examined plaintiff, and his ear was no longer painful. (Echendu Decl. ¶ 11, Exs. 7, 8; Hardy Decl. ¶¶ 9, 14.)

Plaintiff is not competent to opine regarding whether the antibiotic cured his alleged ear infection. However, Dr. Echendu's declaration does not address

---

**5.** The Court notes, however, that plaintiff declares that he suffered pain in his *left* ear, while other portions of his declaration, as well as the medical records, reflect pain and hearing loss in his *right* ear. (*Compare* Hardy Decl. ¶ 17 *with* ¶ 5; Echendu Decl., Ex. 18.)

what the effect, if any, of the Clindamycin prescribed for another condition would have been on plaintiff's ear infection, if he had one, and the Court takes judicial notice that ear infections are often treated with antibiotics. *See Hines ex rel Sevier v. Secretary of the Dep't of Health & Human Services,* 940 F.2d 1518, 1527 (Fed. Cir.1991) ("Well-known medical facts are the types of matters of which judicial notice may be taken."); Fed.R.Evid. 201(b). In the absence of any medical evidence, the Court declines to infer, from undisputed evidence that plaintiff was not suffering from an ear infection on June 21, 2004 and October 19, 2004, that he did not have an ear infection before he started taking the Clindamycin on May 19, 2004. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513 (the court must draw all justifiable inferences in favor of non-moving party). Accordingly, the Court concludes that there is a triable issue as to whether plaintiff had an ear infection constituting a serious medical need while he was under Dr. Echendu's care.

To withstand summary judgment, however, plaintiff must also show a triable issue as to whether Dr. Echendu was deliberately indifferent to plaintiff's medical needs. *See Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Defendants contend that Dr. Echendu did not demonstrate deliberate indifference, because even if plaintiff had an ear infection, Dr. Echendu was not aware of it, and moreover, he referred plaintiff to an audiologist and an ENT specialist and provided plaintiff with a disability accommodation for his hearing loss. (Motion at 11–12; Reply at 4; Echendu Decl. 10, 5, 13, Exs. 6, 10, 11; *see* Echendu Objections at 3–4.) Plaintiff contends that Dr. Echendu was deliberately indifferent to plaintiff's medical needs, because Dr. Echendu refused to examine plaintiff's ear to see if there was an infection, and by the time plaintiff received an antibiotic and saw the ENT specialist, the infection had

already impaired his hearing. (Second Amended Complaint 7.)

As discussed above, plaintiff has declared that he told Dr. Echendu about the pain and hearing difficulty in his right ear and requested an examination of his ear by Dr. Echendu, but Dr. Echendu refused to conduct an examination of plaintiff's ear. (Hardy Decl. ¶¶ 5, 6, 8, 9.) Accepting this evidence as true and drawing all inferences in plaintiff's favor, there is a triable issue of fact as to whether Dr. Echendu knew that plaintiff might have an ear infection, which was causing plaintiff pain and potentially could cause hearing loss, and nevertheless declined to examine and treat plaintiff's ear. *See McGuckin,* 974 F.2d at 1060.

Of course, Dr. Echendu eventually prescribed an antibiotic (although for another condition) which, according to plaintiff, cured the alleged ear infection. A delay in treatment does not constitute deliberate indifference unless it causes further harm. *See Wood,* 900 F.2d at 1335; *Shapley,* 766 F.2d at 407. Plaintiff contends that there was further harm, because Dr. Echendu's failure to treat his ear infection for four months—from February 11, 2004, the date of the first consultation, until May 19, 2004, when Dr. Echendu prescribed an antibiotic for plaintiff—caused plaintiff to suffer hearing loss. (Opposition at 5.)

Defendants do not dispute that plaintiff has suffered hearing loss in his right ear. (Echendu Decl. ¶¶ 9, 12, 13, 18, Exs. 5, 7, 11, 18.) They contend, however, that plaintiff suffered the hearing loss due to an ear infection during his detention at the Jail, months before Dr. Echendu first saw him. (Reply at 3.) There is evidence before the Court that plaintiff was complaining of hearing loss while still at the Jail, and he told the audiologist that he suffered hearing loss at that time. (Laus Decl. ¶ 5(t); Echendu Decl., Ex. 7.) However,

plaintiff has personal knowledge of his ability to hear and contends that he suffered additional hearing loss in his right ear while at CSP–LAC. (Hardy Decl. ¶ 9.) While there is no evidence before the Court enabling a comparison of plaintiff's hearing loss at the Jail and at CSP–LAC, plaintiff is the non-moving party, and the Court must construe the evidence, including all justifiable inferences, in his favor. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. The Court declines to infer, from evidence that plaintiff had already suffered an unspecified degree of hearing loss at the Jail, that he did not suffer any additional hearing loss at CSP–LAC. There is a dispute of fact as to whether Dr. Echendu's four-month failure to treat plaintiff's ear caused or worsened a loss of hearing that ear.

To summarize, plaintiff has submitted evidence that: he suffered from ear infections before arriving at CSP–LAC; Dr. Echendu was informed by plaintiff of the pain and hearing loss in his ear, and several times, plaintiff asked Dr. Echendu to examine his ear; Dr. Echendu never looked inside plaintiff's ear; and although Dr. Echendu ultimately referred plaintiff to an audiologist and an ENT specialist, by that time, plaintiff suffered from hearing loss. Although Dr. Echendu declares that he did not personally observe any indication of an ear infection, he never declares that he actually examined plaintiff's ear, and he does not explain adequately the basis for his conclusion that plaintiff did not have an ear infection. Finally, there is a factual issue as to whether plaintiff sustained his entire hearing loss prior to arriving at CSP–LAC, or whether he suffered additional hearing loss while under Dr. Echendu's care. On this record, there is a triable issue of material fact regarding whether Dr. Echendu purposefully ignored or failed to respond to plaintiff's serious medical need for treatment of his ear, and

whether plaintiff was harmed as a result. *McGuckin,* 974 F.2d at 1060.

Dr. Echendu also contends that he is entitled to qualified immunity. (Motion at 17–18.) State officials acting in their official capacities enjoy qualified immunity from suit. The qualified immunity doctrine protects them not only from ultimate liability, but also from having to litigate at all. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001) ("Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation.") (internal quotation marks and citation omitted).

Previously, under *Saucier,* a two-step procedure for analyzing a state official's qualified immunity defense required the court to consider first whether the facts as alleged, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional right, and only then to determine whether, "in light of the specific context of the case," the constitutional right was so clearly established that a reasonable official would understand that what he or she was doing violated that right. *Saucier,* 533 U.S. at 201–02, 121 S.Ct. at 2156. However, the Supreme Court has recently held that "the *Saucier* procedure should not be regarded as an inflexible requirement," and "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 813, 818, 172 L.Ed.2d 565 (2009). Instead, courts may exercise their discretion as to which of the two prongs of the qualified immunity analysis should be addressed first in the particular case at hand. *Id.* at 818.

For the reasons discussed above, and accepting plaintiff's evidence as true, the record before the Court does not per-

mit a conclusion that a reasonable physician would not have understood that a failure to examine and treat plaintiff's ear in response to his complaints about ear pain and difficulty hearing would violate the Eighth Amendment. *Saucier*, 533 U.S. at 201–02, 121 S.Ct. at 2156. Thus, Dr. Echendu is not entitled to qualified immunity.[6]

Accordingly, Dr. Echendu is not entitled to summary judgment on plaintiff's Eighth Amendment claim for inadequate medical treatment of his ear condition.

### B. Dr. Echendu Is Entitled To Summary Judgment On Plaintiff's Claim For Inadequate Treatment Of His Psoriasis.

Plaintiff contends that Dr. Echendu's treatment of plaintiff's psoriasis was so deficient as to constitute deliberate indifference to serious medical needs. Specifically, plaintiff complains that Dr. Echendu did not follow the dermatologist's recommendation to perform a fasting lipid panel test before prescribing Soriatane, and Dr. Echendu did not refer plaintiff to the dermatologist for a follow-up after he suffered a reaction to the medication. (Second Amended Complaint at 3, 8.)

Defendants do not contest that plaintiff suffered from psoriasis while under Dr. Echendu's care, or that his psoriasis constituted a serious medical need under *Estelle*. (Motion at 12–13.) They contend

only that the uncontested evidence shows that Dr. Echendu was not deliberately indifferent to plaintiff's medical need for treatment of his psoriasis. (*Id.*)

With respect to Dr. Echendu's treatment of plaintiff's psoriasis, the following facts are uncontested. On February 11, 2004, Dr. Echendu saw plaintiff and ordered Lidex cream, hydrocortisone cream, and coal tar shampoo to treat his psoriasis. (Hardy Decl. ¶ 5; Echendu Decl. ¶ 7; Exs. 1 and 2.) On March 11, 2004, Dr. Echendu saw plaintiff and increased his Lidex cream prescription to one tube weekly for two months. (Echendu Decl. ¶ 8, Exs. 3, 4; Hardy Decl. ¶ 6.) On May 19, 2004, Dr. Echendu saw plaintiff and ordered three tubes of hydrocortisone cream per week and Selsun shampoo for 90 days. (Echendu Decl. ¶ 11, Exs. 7, 8; Hardy Decl. ¶ 9.)

Another prison physician then referred plaintiff for a consultation with an outside dermatologist, which took place on August 14, 2004. (Echendu Dec. ¶ 15, Ex. 13; Hardy Decl. ¶ 12.) The outside dermatologist, Dr. Huntley, recommended oral therapy with Soriatane, and treatment with Dovonex cream, triamcinolone ointment, and hydrocortisone.[7] (Echendu Decl., Ex. 13.) On September 9, 2004, Dr. Echendu prescribed all medication recommended by Dr. Huntley, including Soriatane for two months and Dovonex and hydrocortisone creams and triamcinolone ointment for

---

**6.** Because, as discussed below, the Court concludes that plaintiff has not shown a triable issue as to his claim against Dr. Echendu based on the treatment of plaintiff's psoriasis, and as to any of his claims against Dr. Fortaleza, the Court does not address defendants' qualified immunity defense with respect to these claims.

**7.** The recommendation read, in pertinent part, as follows:

I believe Mr. Hardy is going to need intervention with oral therapy to take care of his psoriasis. I recommend obtaining a fasting

lipid panel. He has normal liver function tests now and if his lipid panel is normal, I would start Soriatane ... and repeat the lipid panel in three weeks, as well as liver function tests and CBC. If those are normal, I would continue his treatment with that. I recommend adding Dovonex cream.... I recommend using triamcinolone ointment rather than Lidex ointment.... I recommend using 1 percent hydrocortisone cream.... I would like to see him in about six weeks to reevaluate his response to treatment.

(Echendu Decl., Ex. 13.)

three months, and ordered a fasting lipid blood test to be conducted within 4 days. (Echendu Decl. ¶ 16, Ex. 14, 15.) On November 4, 2004, Dr. Echendu saw plaintiff, prescribed Benadryl for an allergic reaction, and scheduled a follow-up appointment in one week. (Echendu Decl. ¶ 22, Ex. 23; Hardy Decl. ¶ 15.) Plaintiff contends that his allergic reaction was to Soriatane; Dr. Echendu does not state in his declaration for what the Benadryl prescription was prescribed, and progress notes suggest that the allergic reaction was triggered by another of plaintiff's medications. (Echendu Decl. ¶ 22, Ex. 23; Hardy Decl. ¶ 15.) On November 17, 2004, plaintiff saw Dr. Echendu and told him that plaintiff's psoriasis was improving. (Hardy Decl. ¶ 15.) Dr. Echendu's progress notes from that visit also describe plaintiff's lesions as "much improved." (Echendu Decl. ¶ 23, Ex. 23.) According to the record, that was the last time plaintiff saw Dr. Echendu.

Accordingly, Dr. Echendu did not ignore or refuse to treat plaintiff's psoriasis but, instead, provided medical treatment. Thus, to withstand summary judgment, plaintiff must come forth with evidence showing that the treatment chosen by Dr. Echendu was medically unacceptable under the circumstances, and Dr. Echendu chose it in conscious disregard of an excessive risk to the plaintiff's health. *Toguchi,* 391 F.3d at 1058; *Jackson,* 90 F.3d at 332.

■ Plaintiff's evidence falls far short of the requisite showing. For instance, plaintiff declares that Dr. Echendu prescribed medication for his psoriasis without actually examining his back. (Hardy Decl. ¶¶ 5, 6.) Whether or not this was sound medical practice, it is hardly a failing of constitutional magnitude. Plaintiff

argues that, if Dr. Echendu had examined his back and seen the extent of his psoriasis, he would have referred him to an outside dermatologist, as another prison physician did after examining plaintiff. (Opposition at 6; Hardy Decl. ¶¶ 6, 12.) However, the fact that plaintiff was not referred to a dermatologist by Dr. Echendu is irrelevant, because plaintiff was sent to an outside dermatologist by another prison physician.

■ Plaintiff's principal complaint is that Dr. Echendu started him on Soriatane medication without waiting for the results of a fasting lipid panel test, as recommended by the consulting dermatologist, and did not refer plaintiff to the dermatologist for a follow-up after plaintiff developed an allergic reaction. (*See* Second Amended Complaint at 3; Opposition at 6.) The record confirms that Dr. Echendu ordered Soriatane for plaintiff without waiting for the results of a fasting lipid panel test, as Dr. Huntley recommended.[8] (Echendu Decl. 16, Ex. 13.) There is no medical evidence before the Court regarding whether this was acceptable medical practice, or regarding what, if any, risks flowed from plaintiff taking the medication without the benefit of the test results. However, even assuming, *arguendo,* this order by Dr. Echendu was negligent, negligence or malpractice does not violate the Eighth Amendment. *See Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 292; *Toguchi,* 391 F.3d at 1059. There is no evidence before the Court from which it could be inferred that Dr. Echendu was aware of a risk to plaintiff's health from starting plaintiff on Soriatane without waiting for the test and, despite that knowledge, did so. *See Toguchi,* 391 F.3d at 1059 (explaining that phy-

8. According to Dr. Echendu's declaration and plaintiff's medical records, on September 4, 2005, Dr. Echendu ordered Soriatane and a fasting lipid panel blood test to be conducted within four days. (Echendu Decl. ¶ 16, Ex. 13.) The lipid panel test was performed on October 15, 2004. (Echendu Decl., Ex. 15; Hardy Decl., Ex. C.)

sician who treated inmate suffering from withdrawal with medications that caused his death was not deliberately indifferent if she administered the medications without assessing his condition and without regard to possible withdrawal symptoms; to be deliberately indifferent, the physician must have assessed the inmate, determined that he was suffering from withdrawal, and nevertheless administered drugs she knew to be life-threatening). Mere speculation regarding Dr. Echendu's knowledge does not create a factual dispute for purposes of summary judgment. *Id.; see also Nelson v. Pima Community College,* 83 F.3d 1075, 1081–82 (9th Cir.1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment").

Moreover, plaintiff has not submitted medical evidence that he suffered any harm from taking Soriatane before the fasting lipid pan el test was performed. Significantly, plaintiff has not submitted any evidence that a fasting lipid panel test showed or would have showed that the Soriatane was contraindicated.[9] In fact, neither party has submitted medical evidence regarding when Dr. Echendu discontinued plaintiff's Soriatane prescription and why. Although there is evidence that plaintiff suffered an allergic reaction around the time he took Soriatane, plaintiff also was taking various other medications, and there is no medical evidence before the Court which establishes that Soriatane triggered plaintiff's allergic reaction. Moreover, even if the Court assumes, for purposes of this Motion only, that plaintiff suffered an allergic reaction to the Soriatane, and further assumes that the fasting lipid panel test would have shown that plaintiff should not have been taking Soriatane, it does not follow that

Dr. Echendu was deliberately indifferent for prescribing Soriatane without waiting for the test results. Without evidence that Dr. Echendu was aware of the potential harm and consciously disregarded it, plaintiff has shown no more than negligence, if that. *Toguchi,* 391 F.3d at 1058.

Finally, plaintiff complains that Dr. Echendu did not refer him to Dr. Huntley in six weeks for a follow-up appointment, as Dr. Huntley had recommended, and did not do so even after plaintiff suffered an allergic reaction. (Opposition at 6.) Apart from the absence of evidence that plaintiff suffered an allergic reaction to the Soriatane, Dr. Huntley's statement that he "would like to see [plaintiff] in about six weeks to evaluate his response" was hardly a constitutional mandate. Moreover, as of November 17, 2004, the last time plaintiff saw Dr. Echendu, his psoriasis was improving. (Echendu Decl. ¶ 23, Ex. 23; Hardy Decl. ¶ 15.) Dr. Echendu cannot be deemed deliberately indifferent for failing to refer plaintiff to Dr. Huntley at a time when plaintiff's symptoms were improving. *See Calloway v. Contra Costa County Jail Correctional Officers,* 2007 WL 134581, *31 (N.D.Cal.2007) (rejecting "the proposition that a prisoner has an Eighth Amendment right to receive treatment ... with the provider of his choice").

To the extent plaintiff contends, in the Second Amended Complaint, that Dr. Echendu "stopped all treatment" for his psoriasis, this contention is not borne out by the evidence. Dr. Echendu declares that, on September 9, 2004, he ordered for plaintiff, in addition to the Soriatane, the other medications recommended by the dermatologist, namely, Dovonex and hydrocortisone creams and triamcinolone ointment, each for three months. (Echen-

**9.** However, Dr. Fortaleza declares that, on May 25, 2005 (some six months after plaintiff last saw Dr. Echendu), he determined that

plaintiff should not use Soriatane because of his high cholesterol levels. (Fortaleza Decl. ¶ 11, Ex. 6.)

du Decl. ¶ 16, Exs. 14, 15.) The medication records submitted by plaintiff confirm that these medications had a stop date of December 8, 2004, or, in the case of Dovonex, December 12, 2004. (Hardy Decl., Ex. C.) According to the record before the Court, the last time that plaintiff saw Dr. Echendu was November 17, 2004. (Echendu Decl. ¶¶ 6, 23, Ex. 25; Hardy Decl. ¶ 15.)

Accordingly, accepting plaintiff's evidence as true and drawing all inferences in his favor, he has not come forth with evidence that Dr. Echendu denied him medical treatment for his psoriasis, or that Dr. Echendu provided treatment that was medically unacceptable and chosen in conscious disregard of an excessive risk to plaintiff's health. *See Toguchi,* 391 F.3d at 1058; *Jackson,* 90 F.3d at 332. Plaintiff, therefore, has not raised a triable issue of fact with respect to his Eighth Amendment claim against Dr. Echendu based on the treatment of his psoriasis. Accordingly, Dr. Echendu is entitled to summary judgment on this portion of plaintiff's claim.

### III. *DR. FORTALEZA IS ENTITLED TO SUMMARY JUDGMENT.*

In the remaining portions of Claim Four, plaintiff contends that Dr. Fortaleza threatened to withhold medical treatment if plaintiff did not withdraw his grievances regarding his medical care, and Dr. Fortaleza acted upon that threat by: (1) failing to renew plaintiff's psoriasis and blood pressure medications; (2) failing to refer plaintiff to a dermatologist for his psoriasis; and (3) refusing to place plaintiff on medically unassigned status due to his back pain.[10] (Second Amended Complaint at 3–4, 8.) Plaintiff contends that Dr. For-

taleza's actions constituted deliberate indifference to plaintiff's serious medical needs, in violation of the Eighth Amendment, and also constituted retaliation for plaintiff's exercise of his First Amendment rights.

### A. *Eighth Amendment*

■ The parties dispute whether Dr. Fortaleza threatened to withhold medical treatment from plaintiff when Dr. Fortaleza interviewed plaintiff about his grievance on January 31, 2005. Plaintiff declares that Dr. Fortaleza made such a threat; Dr. Fortaleza declares that he did not. (Hardy Decl. ¶ 19; Fortaleza Decl. ¶ 7.) However, threats alone are not actionable under the Eighth Amendment. *See Gaut v. Sunn,* 810 F.2d 923, 925 (9th Cir.1987). Even if Dr. Fortaleza made such a threat, he is not liable under the Eighth Amendment unless he acted upon the threat by denying plaintiff medical care in deliberate indifference to his serious medical needs. Given that, on summary judgment, the Court must accept plaintiff's evidence as true, the Court will assume that Dr. Fortaleza made the alleged threat and will consider whether there is a triable issue that he denied plaintiff the above-mentioned medical care and did so to carry out his threat, rather than for medical reasons. *See Jackson,* 90 F.3d at 332 (plaintiff could prove deliberate indifference by showing that doctors denied him a kidney transplant on account of personal animosity, rather than because of "an honest medical judgment," and that the delay was medically unacceptable).

### 1. *Renewal Of Psoriasis And Hypertension Medication*

■ Plaintiff contends that Dr. Fortaleza refused to renew his psoriasis and

---

**10.** Plaintiff also contends that Dr. Fortaleza falsified his medical records by misstating one of the dates on which he saw plaintiff. (Second Amended Complaint at 4, 9.) This does not constitute an Eighth Amendment violation, and there is no evidence that the alleged misstatement was retaliatory.

blood pressure medications. (Second Amended Complaint at 8.) The record belies this contention. According to Dr. Fortaleza's declaration and plaintiff's medical records, on March 7, 2005, Dr. Fortaleza saw plaintiff and ordered, among other things, Dovonex ointment, Lidex ointment, and hydrocortisone cream for plaintiff's psoriasis, and Enalapril for his hypertension. (Fortaleza Decl. ¶ 8, Ex. 2.) The psoriasis medications were to be refilled every 90 days for one year. (Fortaleza Decl. ¶ 8, Ex. 2.) On March 11, 2005, Dr. Fortaleza ordered a new prescription for Enalapril to be refilled every 90 days for one year. (Fortaleza Decl. ¶ 9, Ex. 3.) On May 25, 2005, Dr. Fortaleza recommended Dovonex or Kenalog for consideration by the physician assigned to plaintiff's yard. (Fortaleza Decl. ¶ 11, Ex. 6.) On June 1, 2005, Dr. Fortaleza ordered a new prescription for Dovonex to be refilled every 90 days for one year. (Fortaleza Decl. ¶ 12, Exs. 7, 8.)

Plaintiff does not dispute that Dr. Fortaleza ordered these medications. His claim appears to rest on his allegations that, on February 15, 2005, March 2, 2005, and March 3, 2005, he attempted to see Dr. Fortaleza to obtain renewal of his psoriasis and blood pressure medications but was "turned away." (Second Amended Complaint at 8.) However, plaintiff nowhere declares that it was Dr. Fortaleza who turned plaintiff away. Moreover, at that time, plaintiff had not yet had a medical consultation with Dr. Fortaleza but had only an interview with the physician regarding plaintiff's administrative appeal. (Fortaleza Decl. ¶ 7, Ex. 1; Hardy Decl. ¶ 19.) Dr. Fortaleza renewed plaintiff's psoriasis and hypertension medications during plaintiff's first medical consultation on March 7, 2005. (Fortaleza Decl. ¶ 8, Ex. 2.)

Accordingly, plaintiff has not shown a triable issue of fact as to deliberate indifference by Dr. Fortaleza with respect to renewal of his psoriasis and hypertension medications. Dr. Fortaleza is entitled to summary judgment on this portion of plaintiff's Eighth Amendment claim.

### 2. *Dermatologist Referral*

▮ Plaintiff contends that Dr. Fortaleza did not refer him for a follow-up consultation with dermatologist Dr. Huntley. (Second Amended Complaint at 3). However, the record shows that, on June 1, 2005, Dr. Fortaleza prepared and signed a "Physician Request for Services," requesting that plaintiff be provided with a consultation with Dr. Huntley. (Fortaleza Decl. ¶ 12, Ex. 9.)

Plaintiff declares that the consultation never took place, and he was not seen by Dr. Huntley until many months later, when he was at Mule Creek State Prison. (Hardy Decl. ¶ 24.) To corroborate his assertion, plaintiff points out that Dr. Huntley's report describing his examination of plaintiff on April 17, 2007, refers to an earlier examination in "August of 2004" in such a way as to imply that it was his *only* previous examination of plaintiff. (*Id.,* Ex. G.) Defendants have submitted no evidence on this point. Thus, it is uncontroverted that plaintiff did not receive a follow-up consultation with Dr. Huntley while he was at CSP–LAC.

Nevertheless, this is not enough to show deliberate indifference by Dr. Fortaleza. Dr. Fortaleza ordered the consultation.[11]

---

11. Dr. Fortaleza described the need for a consultation as "routine" rather than "emergent" or "urgent." (Fortaleza Decl., Ex. 9.) However, there is no evidence before the Court that plaintiff's long-standing psoriasis medically warranted a description as "emergent" and "urgent," or that Dr. Fortaleza was actuated by impermissible motives when he described the requested consultation as "routine."

Moreover, three and a half months later, on September 15, 2005, plaintiff notified the Court that he had been transferred from CSP–LAC to Avenal State Prison. After that time, Dr. Fortaleza had no further responsibility for plaintiff's medical care.

Accordingly, plaintiff has not shown a triable issue of fact as to deliberate indifference by Dr. Fortaleza with respect to a follow-up consultation for plaintiff with a dermatologist. Because Dr. Fortaleza referred plaintiff for a consultation with an outside dermatologist, he cannot be deemed deliberately indifferent for failing to do so. Thus, Dr. Fortaleza is entitled to summary judgment as to this portion of plaintiff's Eighth Amendment claim.

### 3. *Medically Unassigned Status*

▉ Plaintiff contends that Dr. Fortaleza acted on his threat to withhold medical care by refusing to approve a "lay-in," or reduction of duties, based on plaintiff's back problems. (Second Amended Complaint at 3–4.)

It is undisputed that, on July 19, 2005, Dr. Fortaleza interviewed plaintiff regarding his request to be placed on medically unassigned status and for a special mattress, and the physician denied both requests. (Fortaleza Decl. ¶ 15, Ex. 12; Hardy Decl. ¶ 20.) Dr. Fortaleza declares that he denied the requests because: plaintiff's medical records did not contain any medical documentation of a prior back surgery; plaintiff had not complained of a chronic back condition since December 2003; and Dr. Fortaleza's observations of plaintiff showed him to have a normal ambulatory gait and a normal range of back motion. (Fortaleza Decl. ¶ 15, Ex. 12.) Dr. Fortaleza declares that, based on these observations, he concluded that plaintiff's requests were not medically justified. (*Id.*)

Plaintiff agrees that Dr. Fortaleza indicated that he was denying plaintiff's requests because there was nothing in plaintiff's medical records about a back surgery and he "walked fine and got around alright." (Hardy Decl. ¶ 21.) According to plaintiff, however, his ability to walk was irrelevant to his need for a "lay in," because it was the lifting and twisting required by his kitchen duties that hurt his back. (*Id.;* Second Amended Complaint at 9.) Plaintiff complains that his request was denied by Dr. Fortaleza without an examination of plaintiff's back (which would have revealed his surgery scar) or an xray, and without any attempt by Dr. Fortaleza to obtain the records pertaining to plaintiff's 1993 back surgery from the Utah hospital where it was performed. (Hardy Decl. ¶ 21; Opposition at 9; *see* Walton Decl. ¶ 2.) Finally, plaintiff points out that when he was transferred to Avenal State Prison and Mule Creek State Prison, those institutions recognized his back problems by granting him "lower bunk chronos." (Hardy Decl. ¶ 22, Exs. E, F.)

Plaintiff's argument shows, at most, negligence on the part of Dr. Fortaleza. *See Toguchi,* 391 F.3d at 1059 (when expert's opinion was predicated on the position that defendant physician administered medications without assessing plaintiff's medical condition, the accusation was of negligence rather than conscious disregard of risk of harm, and did not show deliberate indifference). There is no evidence that Dr. Fortaleza was aware of a serious risk of harm to plaintiff's back if plaintiff continued in his kitchen job assignment, yet nevertheless refused plaintiff's request for a "lay in." *Id.* The reasons given by Dr. Fortaleza for his decision, which included an absence of evidence that plaintiff had been complaining of back pain during his frequent visits to the medical clinic, and observations regarding plaintiff's gait and range of back motion, are reasonable and do not support an inference that Dr. For-

taleza denied the request for non-medical reasons.

Plaintiff, therefore, has not raised a triable issue regarding whether Dr. Fortaleza was deliberately indifferent to plaintiff's serious medical needs when Dr. Fortaleza denied plaintiff's request for medically unassigned status. Dr. Fortaleza, therefore, is entitled to summary judgment on this portion of plaintiff's Eighth Amendment claim.

## B. *Retaliation*

In the prison context, "a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir.2005) (*internal footnote omitted*); *see also Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995); *Barnett v. Centoni*, 31 F.3d 813, 815–16 (9th Cir.1994). Adverse action is action that "would chill a person of ordinary firmness" from engaging in that activity. *Pinard v. Clatskanie School District*, 467 F.3d 755, 770 (9th Cir.2006). Plaintiff has the burden of proving that his exercise of his First Amendment rights was a substantial or motivating factor behind defendant's conduct. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989). Plaintiff also bears the burden of proving the absence of legitimate correctional goals for the conduct of which he complains. *Pratt*, 65 F.3d at 806.

Plaintiff declares that, on January 31, 2005, Dr. Fortaleza interviewed him regarding his grievance concerning Dr.

Echendu's failure to order a fasting lipid panel prior to prescribing Soriatane. (Hardy Decl. ¶ 19.) Plaintiff declares that Dr. Fortaleza told him that if he did not withdraw all his medical appeals pertaining to Facility B medical staff, Dr. Fortaleza "would make sure that [plaintiff] would never get any sort of medical treatment by him." (*Id.*) Plaintiff "sincerely thought about ceding to [Dr. Fortaleza]'s demands," but then refused. (*Id.*)

Dr. Fortaleza declares that he never told plaintiff, either during the January 31, 2005 interview or at any other time, that plaintiff would not receive any medical care from him until plaintiff withdrew his administrative appeals. (Fortaleza Decl. ¶ 7.) Thus, there is a dispute of fact as to whether Dr. Fortaleza made the threat. However, a threat to retaliate does not violate Section 1983 if the person making the threat never follows through. *See Gaut*, 810 F.2d at 925 (prisoner's allegation that he was threatened with bodily harm if he pursued legal redress for beatings did not state a Section 1983 claim); *Jimenez v. Cox*, 2009 WL 77272, *5 (D.Nev. Jan. 8, 2009) ("Evidence of a threat to retaliate alone is insufficient to support a claim of retaliation."). Thus, assuming, for purposes of this Motion, that Dr. Fortaleza made the threat described in plaintiff's declaration, Dr. Fortaleza nevertheless is entitled to summary judgment unless plaintiff comes forth with evidence that Dr. Fortaleza acted upon the alleged threat or otherwise retaliated against plaintiff.

Plaintiff argues that Dr. Fortaleza's failure to examine his back before denying his request for medically unassigned status gives rise to an inference that Dr. Fortaleza refused the request for retaliatory reasons. (Supp. Opp. at 3; *see* Supplemental Declaration of Plaintiff Chester Hardy, dated July 8, 2009 ("Supp.

Hardy Dec.") ¶ 2.) Plaintiff is correct that he does not need to show deliberate indifference on the part of Dr. Fortaleza to hold him liable for retaliation. *See Mt. Healthy*, 429 U.S. at 283–84, 97 S.Ct. at 574 (retaliation for exercise of constitutional right is actionable under Section 1983 even if acts would not be unconstitutional if taken for different reasons). He must, however, show retaliatory conduct, *i.e.*, "adverse action," by Dr. Fortaleza. *Rhodes*, 408 F.3d at 567. Plaintiff's contention that Dr. Fortaleza acted negligently for retaliatory reasons makes no sense. (*See* Supp. Opp. at 4.) If Dr. Fortaleza acted negligently, he cannot have acted in retaliation for plaintiff's filing of grievances. *See Allen v. Iranon*, 283 F.3d 1070, 1076 n. 5 (9th Cir.2002) (acknowledging that proof of negligence cannot support a Section 1983 retaliation claim); *Carhart v. Smith*, 178 F.Supp.2d 1068, 1073 (D.Neb. 2001) (noting illogic of "negligent retaliation"). Moreover, as the Court has discussed in connection with plaintiff's Eighth Amendment claim, the reasons given by Dr. Fortaleza for his decision to deny plaintiff's request for medically unassigned status—his observations of plaintiff's gait and range of motion and the absence of documentation of plaintiff's back surgery in his file (Fortaleza Decl. ¶¶ 15, 21)—do not support an inference that Dr. Fortaleza was acting for non-medical reasons.

Plaintiff also contends that Dr. Fortaleza was retaliating for plaintiff's filing of grievances when the physician refused to issue plaintiff, whose infected big toe prevented him from wearing shoes, a "lie in," which would have enabled plaintiff to eat in his cell. (Supp. Opp. at 4.) However, plaintiff's claims relating to Dr. Fortaleza's treatment of his big toe have been dismissed as unexhausted. (August 13, 2007 Report and Recommendation at 21; November 15, 2007 Order at 2.)

▮▮▮ As regards Dr. Fortaleza's alleged failure to renew plaintiff's psoriasis and blood pressure medications and to refer him to a dermatologist for his psoriasis, plaintiff's retaliation claims fail for lack of evidence of any "adverse action." As discussed in connection with plaintiff's Eighth Amendment claims, Dr. Fortaleza renewed plaintiff's medication during plaintiff's first medical visit with him, and Dr. Fortaleza also referred plaintiff to a dermatologist. (*See* Fortaleza Decl. ¶¶ 8, 12, Exs. 2, 9.)

Thus, plaintiff has not shown that Dr. Fortaleza withheld medical care from plaintiff, or provided him with inferior medical care, in retaliation for the exercise of his constitutional rights. Plaintiff, therefore, has failed to raise a triable issue of fact as to an essential element of a retaliation claim, namely, "adverse action." [12] *See Rhodes*, 408 F.3d at 567 (to succeed in a retaliation claim, plaintiff must demonstrate an adverse action); *London v. Williams*, 2009 WL 567883 (9th Cir. March 6, 2009) (affirming summary judgment in favor of medical providers because prisoner did not show that denial of his request for medication that was not medically warranted was an "adverse action"). [13] Accordingly, Dr. Fortaleza is entitled to summary judgment as to plaintiff's retaliation claim.

\* \* \*

12. Because plaintiff's failure to provide evidence of "adverse action" mandates summary judgment in Dr. Fortaleza's favor, the Court will not address defendants' argument that plaintiff's continued pursuit of medical grievances shows that his First Amendment rights were not chilled. (Def. Supp. Brief at 6.) The Court notes, however, that the Ninth Circuit has held that speech can be chilled even when it is not completely silenced. *Rhodes*, 408 F.3d at 568–69.

13. The Court may cite unpublished Ninth Circuit opinions issued on or after January 1, 2007. *See* U.S.Ct.App. 9th Cir. Rule 36–3; Fed. R.App. P. 32.1(a).

Accordingly, Dr. Fortaleza is entitled to summary judgment as to all of plaintiff's claims against him.

### RECOMMENDATION

For all of the foregoing reasons, IT IS RECOMMENDED that the District Judge issue an Order:

(1) accepting and adopting this Amended Report and Recommendation; and

(2) denying in part and granting in part defendants' motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, as follows:

(a) denying Dr. Echendu's motion for summary judgment with respect to plaintiff's Eighth Amendment claim based on his alleged ear infection and hearing loss;

(b) granting Dr. Echendu's motion for summary judgment with respect to plaintiff's Eighth Amendment claim based on his psoriasis; and

(c) granting Dr. Fortaleza's motion for summary judgment and dismissing the action as against him.[14]

---

14. If the District Judge adopts these recommendations, the only defendant remaining in the action will be Dr. Echendu, and the only claim remaining will be that portion of Claim Three pertaining to Dr. Echendu's treatment of plaintiff's ear.